**HOWARD P. FOLEY CO., Inc., v. UNITED STATES.**

No. 45739.

Court of Claims.

Dec. 3, 1945.

214

Alexander M. Heron, of Washington, D. C. (Hinton & Hinton, of Washington, D. C., on the brief), for plaintiff.

Robert Burstein, of Washington, D. C., and John F. Sonnett, Acting Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHALEY, Chief Justice.

The plaintiff had a contract with the Civil Aeronautics Authority to furnish and install the field lighting at the Washington National Airport.

The airport was constructed at Gravelly Point, Virginia, and was on "made land." The site was created by hydraulic dredging and one of the problems before the Government engineers was how to expedite stabilization of the dredged material, which of course was heavily charged with water. Instead of using the conventional method of erecting boundary dykes and pouring the dredged material within the boundary thus made, with overflowing water, the engineers conceived the idea of pouring the dredged material directly on the location of the projected runways, letting the finer materials flow off to the sides. Even with this expedited process there were difficulties that retarded the work, for pockets of fines would inevitably form, and, where two dredges worked toward each other, there would be fine material at the point of union, which had to be excavated and replaced with compactible material, necessary for the foundation of the runway. The runways were to bear the burden of heavy traffic, the landing and taking off of planes.

Plaintiff's work could not proceed until the ground was ready. Plaintiff claims that its work, or some of it, could have proceeded before the final surface had been finished, but that was a matter for de-

fendant's engineers, not the plaintiff, to decide. Plaintiff's work was essentially a "follow-up" job, just as is that of a plumber.

Article 1–11 of the specifications gave direction of the work to the Government's representative.

Regardless of any eventual practical considerations in the field, plaintiff knew beforehand that releases would be made to it only as paving of runways and rough-grading of shoulders were completed. Article 5–2 of the specifications gave priority to such paving and rough-grading.

Plaintiff's complaint, however, is not that the work was released to it in sections, but that the releases were so far apart as to extend its time for performance unduly and unreasonably.

The contracting officer seems to attribute some of the delay to the paving contractor, but the plaintiff does not rely on the paving contractor's responsibility for tardiness and we are without factual information with regard thereto.

The Government's representatives and operating force acted with great, if not unusual, diligence. They availed themselves of novel methods to assure expedition. No fault is or can be attributed to them.

The contracting officer's findings of fact charge delay in releasing certain stabilized areas to "unforeseen" soil conditions. This job involved an hydraulic fill. In every respect operations appear to have proceeded according to plan, a novel plan, and the plan, so pursued, expedited matters greatly.

But charging delay to "unforeseen" conditions is not charging them to "unforeseeable" conditions, which Article 9 of the contract provides for. There is nothing present in the contract situation, as evidenced here, that made soil conditions unforeseeable. Apparently the fill was just what was expected, the coarser material remaining in the runway, the fines sloughing off to the side, precisely as planned.

There is no other conclusion than that the original time limitation of 120 days was a mistaken calculation, neither more nor less. It turned out that way, whether the Government's contracting officer knew it in the beginning or not.

This case is to be distinguished from Crook Co. v. United States, 270 U. S. 4, 46 S.Ct. 184, 70 L.Ed. 438. In that case it was said, referring to a time limitation such as we have here: "But it was obvious on the face of the contract that this date was provisional. The Government reserved the right to make changes and to interrupt the stipulated continuity of the work." Id., 270 U.S. at page 6, 46 S.Ct. 184, 70 L.Ed. 438. We understand this to mean that the provisional nature of the time limitation, is just that, "provisional" not independent, and what makes it provisional is the reservation of "the right to make changes and to interrupt the stipulated continuity of the work." What the Supreme Court was considering was the interlocking of two contracts, the construction or prime contract and the follow-up contract. In the instant case there is no construction or prime contract, except as plaintiff's contract may be considered the "prime" contract.

In the Crook case, supra, the right to make changes in the prime contract was operative and that is what the Supreme Court obviously had in mind. The construction work was being done by the prime contractor, the Crook Company's work of installing a heating system being dependent upon the prime contractor's progress. The fact that the basic work of construction was being done by another contractor brought the provision for changes into play.

The Government does not order itself to make changes. The contracting officer's findings of fact indicate that the grading was done by "force account," that is, by a force of men hired by the Government, and not done through a contractor, except as to paving, in respect to which there is no record upon which any material finding can be made. Under these circumstances, there was no room for changes. There was no prime contract to be changed.

The time limitation in plaintiff's contract therefore, under this view, was not provisional, because provisionality was dependent upon the existence of an operative change clause in the prime contract. This change clause is here wholly absent, and the Government's obligation is fixed accordingly.

It would be a strained construction to take the contract here in suit as allowing one of the contracting parties, the defending Government, an unlimited time for performance.

The Government set the time for performance, 120 days, and both parties had certain things to do within that time. The period of actual performance turned out to be 277 calendar days, as compared with the

216

original contract time of 120 days. As appears by the findings of fact, plaintiff's was a follow-up contract, so that the period of 277 days represents practically the time consumed by both parties running concurrently. The extra time of 157 days is not chargeable to delays, strictly speaking, for defendant's engineers were "skillful and diligent in their work." It is not chargeable to changes, for there were none. It is not chargeable to any act committed or omitted by the plaintiff.

There is no prime contractor here that might have delayed the plaintiff's work, a situation present in the Crook Co. case, supra, which would give a provisional character to the time clause. In the Crook case the presence of a prime contractor made the time clause in the follow-up contract provisional, because the prime contractor might not keep up to time. In the Crook case "the contract," as the Court said, "showed that the specific buildings referred to were in process of construction by contractors who might not keep up to time." We cannot twist this statement into reading: "by the Government, which might not keep up to time."

In the case we have here the Government of course might not keep up to time, but the time the Government was to keep up to was the time of 120 days, fixed by the Government itself, and when the Government failed to "keep up to time," it necessarily breached its contract.

▇ Under the circumstances we must conclude that the limitation of 120 days had not the provisional character found to exist in the Crook case; that it was therefore an obligation of the Government, party to the contract, to make performance within 120 days possible. Part of the agreed performance by the Government was to make the performance required of the plaintiff possible. The Government failed in such performance and must respond in damages for the breach.

United States v. Rice, reported 317 U.S. 61, 63 S.Ct. 120, 123, 87 L.Ed. 53, was taken for review by the Supreme Court for alleged conflict with the Crook case. In the Rice case the respondent was the plumbing, heating, and electrical contractor, following up the principal contract of construction. There, as in the Crook case, there was a prime contract, as there is not here. The Court held that the time for performance of the follow-up contract was provisional, as in the Crook case, and stated:

"If there are rights to recover damages where the government *exercises its reserved power to delay,* they must be found in the particular provisions fixing the rights of the parties." [Italics supplied.]

The delay the Court referred to was delay "incident to the permitted changes."

In the case now presented there were no changes, and any supposed power given to delay on account of changes was not only not exercised, but could not have been exercised, because there was no prime contract in existence giving that power.

The reason given therefore in the Crook and Rice cases, for construing the time limitation in a follow-up contract as not binding upon the Government, is absent in the present case. There is here only one contract in issue, a contract that followed up the Government's work directly, that did not follow up the work of another or prime contractor.

▇ It may be noted that the commissioner who reported on the case concluded, with respect to certain extra expenses, that there was no way from the record of determining their reasonable amount. The plaintiff excepts to this and suggests a "jury verdict" fixing the amount. But there must be some guide even for a jury verdict, it must not be based on speculation, and the proponent is not without obligation to proffer this guide, even though its adoption might tend to decrease the amount sued for. See Owen, trustee, v. United States, 8 F.Supp. 707, 80 Ct.Cl. 249, 256.

▇ The plaintiff also claims 10 percent for overhead on an item of $6,393.69, made up of $5,996.65 for payroll of supervisory employees and $397.04 for compensation insurance, etc. Supervision is overhead, as distinguished from direct labor, and we are satisfied that an additional 10 percent is improper.

▇ Judgment will be limited to $6,393.-69. The plaintiff is entitled to recovery of that amount and entry of judgment will be made accordingly. It is so ordered.

JONES, WHITAKER, and LITTLETON, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.